**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| FLUOR CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | No. 4:16CV00429 ERW |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Fluor Corporation's Notice of Motion to determine Policy Limits [681] requesting a determination of the policy limits at issuance in this case [545].

**I.      BACKGROUND**

On July 12, 2021, the Court denied Zurich's Rule 16 Motion, noting it was an improper vehicle for determining policy limits which should have been more appropriately determined through a motion for summary judgment. In its denial the Court noted although a determination of policy limits as a matter of law was necessary to establish Fluor's third element of bad faith failure to settle, as well as Zurich's request for a declaration that its policy limits were exhausted, neither party timely sought adjudication of this issue despite being afforded ample opportunity to do so under the Court's five case management orders.  The Court therefore ordered an expedited summary judgment briefing of this matter to enable the Court to determine the policy limits as a matter of law before the trial set for July 26, 2021. As Zurich had previously briefed its position, the Court ordered Fluor to file a motion to determine policy limits and a statement of facts.  The

1

Court further ordered Zurich to respond to Fluor's motion, and provided Fluor the opportunity to reply.

In accordance with the Court's briefing schedule, on July 16, 2021, Fluor filed a Motion to Determine Policy Limits and a Statement of Uncontroverted Material Facts in Support (ECF No. 683). On July 20, 2021, in accordance with the Court's briefing schedule, Zurich filed its Response in Opposition to Fluor's Motion to Determine Policy Limits. On July 22, 2021, Fluor filed its Reply. The parties previously briefed this issue in conjunction with Zurich's Rule 16 motion. Thus, the matter has been fully briefed before the Court. Both parties have been afforded reasonable and adequate opportunity to present evidence in support of their position (and in opposition).

## II.    STANDARD

Summary judgment is appropriate if there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–90 (1986). A material fact is one which might affect the outcome of the suit, and a genuine dispute exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Federal district courts may *sua sponte* grant summary judgment to a nonmoving party when the losing party is given sufficient advance notice and an adequate opportunity to submit evidence in opposition. Fed. R. Civ. P. 56(f)(1); *Chrysler Credit Corp. v. Cathey*, 977 F.2d 447, 449 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986); *Interco Inc. v. Nat'l Sur. Corp.*, 900 F.2d 1264, 1269 (8th Cir. 1990)). Granting summary judgment under these

circumstances accomplishes the primary objective of Rule 56 – expeditious disposition of cases. *Interco Inc.*, 900 F.2d at 1269.  The requirements of Rule 56(f) are met when the losing party moves for summary judgment on the relevant issue, because that party "obviously expect[s] the district court to make a final ruling" and agrees to resolution of the issue "in summary fashion." *Johnson v. Bismarck Pub. Sch. Dist.*, 949 F.2d 1000, 1005 (8th Cir. 1991); *see also Lester v. Wildwood Fin. Grp., Ltd.*, 205 F.3d 1346 (8th Cir. 2000).

Under Missouri law, "the interpretation of an insurance contract is generally a question of law, particularly in reference to the question of coverage." *D.R. Sherry Const., Ltd. v. Am. Fam. Mut. Ins. Co.*, 316 S.W.3d 899, 902 (Mo. banc 2010).  It is the insured's burden to establish coverage under the policy and the insurer's burden to show that an exclusion to coverage applies. *Elec. Power Sys. Int'l, Inc. v. Zurich Am. Ins. Co.*, 880 F.3d 1007, 1009 (8th Cir. 2018) (citing *Taylor v. Bar Plan Mut. Ins. Co.*, 457 S.W.3d 340, 344 (Mo. banc 2015)). Missouri courts strictly construe exclusionary clauses against the insurer. *Id.*

Often, the court must decide whether the parties' dispute is over the applicability of a coverage provision that the insured bears the burden of establishing, or over the extent of a policy exclusion for which the insurer bears the burden of proof.  *Manner v. Schiermeier*, 393 S.W.3d 58, 63 (Mo. 2013).  The parties here dispute whether the insured or insurer bears the burden of establishing the policy limits at issue here. Fluor argues policy limits should be treated like a policy exclusion and therefore Zurich bears the burden of proof. [1] The Court disagrees.

---

[1] Fluor cites to *S. Gen. Ins. Co. v. WEB Assocs./Elecs., Inc.*, 879 S.W.2d 780, 782 (Mo. Ct. App. 1994) and *JAM Inc. v. Nautilus Ins. Co.*, 128 S.W.3d 879, 893–94 (Mo. Ct. App. 2004) in support of its assertion that policy limits are actually exclusions, placing any burden of proof on the insurer.  The Court finds neither case persuasive.  In *WEB Assocs*, there was no challenge to the stated policy limits in the insuring agreement for each person and each occurrence under the policy. 879 S.W.2d at 782.  Instead, the court addressed an ambiguity created by an exclusion

The Court does not find policy limits constitute an exclusion or an exception from coverage. Policy limits do not cut down, restrict or limit the insurance coverage granted as an exclusion does. *See Krombach v. Mayflower Ins. Co.*, 827 S.W. 2d 208, 210-11 (Mo. 1992). Instead, policy limits endow coverage up to a certain value that has been bargained for by the parties and is part of the insuring agreement's grant of coverage. As noted by Zurich, policy limits are generally stated for each type of coverage afforded under the policy on the Declarations page and are not included in the separate sections containing exclusions and conditions to the coverage. Under Missouri law, it is clear the insured has the burden to show that the policy covers the loss. *J.E. Jones Const. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337, 340 (8th Cir. 2007) (noting insured had burden to establish whether the cause of third parties' injuries constituted an occurrence under the policy at issue). Accordingly, the Court finds Fluor bears the burden of proof with regard to establishing policy limits.

## III.    FACTUAL BACKGROUND

Beginning in the 1990s, residents of Herculaneum, Missouri started bringing lawsuits against Doe Run, Fluor, and other defendants. The plaintiffs in those cases claimed they had suffered bodily injury caused by the Herculaneum lead smelter. From 2002-2011, attorneys Mark Bronson and Gerson Smoger filed a number of these lawsuits (the "Bronson/Smoger lawsuits") on behalf of plaintiffs alleging liability against Doe Run and Fluor based upon claims of bodily injury caused by exposure to lead, metals and other toxic substances from the smelter.

Fluor owned the smelter from 1981 to 1994. Between February 4, 1981 and June 1, 1985, Zurich issued four commercial general liability insurance policies to St. Joe Minerals (which

---

(labelled a condition) which reduced the available policy limits available to injured family members of the insured. *Id.* In *JAM Inc.*, policy limits are not even addressed.

Fluor owned as its sole stockholder).  During the relevant years of the Policies the Herculaneum lead smelter operated continually, emitting lead into the air and environment which settled on the soil of the nearby community. The lead was present in residential yards, church property, public parks, ball fields, streets, ambient air and soil in and around Herculaneum.  The Bronson/Smoger plaintiffs' continuous or repeated exposure to this lead caused bodily injury damages.

<u>**Allegations in the Bronson/Smoger Lawsuits**</u>

In their complaints, the Bronson-Smoger Plaintiffs generally made the following allegations:

- At all relevant times, Plaintiffs are either residents or former residents of Herculaneum, Missouri, who were exposed to lead, metals, and other toxic substances released from and/or originating in the Doe Run Smelter . . . located in Herculaneum, Missouri.

- During the course of its operations, and at all times relevant hereto, the Doe Run Smelter mined, smelted, generated, released, dumped, deposited, and placed into the air, the environment, and onto and in and beyond the plant boundaries, including the air, land, soil, streets, property and environment of Herculaneum and surrounding communities, lead, and other toxic metals and substances.

- The Missouri Department of Health declared Herculaneum's lead contamination caused by the Doe Run Smelter to be a clear and present and imminent and substantial endangerment to the citizens of Herculaneum, especially young children and pregnant women, citing the recent discovery of extremely elevated levels of lead contamination on some streets, yards, and play areas in Herculaneum.

- Results of soil and environmental lead tests demonstrated high, dangerous and hazardous lead levels in residential yards, public properties, inside residential homes including the bedrooms of children, and other areas in and around Herculaneum.

- Human exposure to lead, metals, and other toxic substances released into the environment by The Doe Run Smelter, and the Doe Run defendants, and each of them, causes lead poisoning which can cause physical and personal injuries, including, but not limited to, permanent brain damage and neurological abnormalities, learning disability, loss of memory, headache, insomnia, weight loss, hyper-irritability, muscle weakness and paralysis, joint pain, metallic taste, nervous system disturbances, aphasia, anemia, trembling, degenerative disease of the brain, kidney damage, peripheral neuropathy, convulsions, coma, cancer of the respiratory tract, reproductive dysfunction, and death.

- As a direct and proximate result of the wrongful acts and conduct of the defendants, and each of them, hereinafter alleged, each of the plaintiffs herein have had, and/or have, elevated levels of lead in their body, and each of the plaintiffs herein have suffered, continue to suffer, and will in the future suffer, from lead poisoning and from exposure to the lead, metals and other hazardous and toxic substances described herein.

## IV.    RELEVANT POLICY PROVISIONS

Zurich issued four comprehensive general liability ("CGL") insurance policies to St. Joe Minerals Corporation which, in conjunction, cover the period from March 15, 1981 through June 1, 1985. These four Zurich polices were active during four distinct time periods:

•February 4, 1981 to February 4, 1982 (policy number 89-11-952) ("1981 Policy");

•February 4, 1982 to February 4, 1983 (policy number 80-60-784) ("1982 Policy");

•February 4, 1983 to February 4, 1984 (policy number 8-72-010) ("1983 Policy"); and

•February 4, 1984 to June 1, 1985 (policy number 32-51-983-00 (-01)) ("1984 Policy").

The Zurich Policies are standard form CGL policies, containing various lines of coverage including bodily injury, personal injury, property damage, contract liability, personal injury, and employee or professional liability. The underlying lawsuits filed by attorneys Mark Bronson and Gerson Smoger against Fluor and Doe Run implicated the bodily injury coverage in the policies and applies to those Bronson/Smoger plaintiffs who were exposed to lead emitted by the Herculaneum smelter between 1981 and 1985.

### Bodily Injury Liability Provisions

Each of the four policies includes a Declarations page that describes the scope and type of coverage provided under the Policies. Relevant here, each Policy's Declarations form indicates insurance is afforded for the Coverage Part - Comprehensive General Liability Insurance, which contains coverage for both "Bodily Injury Liability" and "Property Damage Liability."[2] In each policy, Zurich agreed to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

A. bodily injury or

B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay and claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Bodily injury is defined as "bodily injury, sickness, or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."

---

[2] It is undisputed Property Damage Liability is not at issue here.

The Limits of Liability provisions in the Policies define the total amount of money that could be paid out per occurrence for bodily injury, irrespective of the number of insureds, persons who sustain bodily injury or the number of claims made or suits brought. Further, these provisions expressly state the total liability of the company for all damages because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit stated in the declarations page as "each occurrence." Finally, the provisions expressly state that for the purpose of determining the limit of liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

These provisions, quoted below, were the same for the 1981-1982, 1982-1983, and 1984-1985 policies.[3] Those policies each included the following Limits of Liability provision:

> Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:
>
> Coverage A - The total liability of the company for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence."
>
> Subject to the above provision respecting "each occurrence", the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate".
>
> Coverage A and B - For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to

---

[3] The language of the Limits of Liability provisions in the 1983-1984 Policy differs from the language recited in the other three Policies. Specifically, the provision referring to the aggregate limit in the 1983-1984 policy is not restricted to "completed operations hazard" and "products hazard" claims as it is in the other three Policies.  The 1983-1984 Policy's Limits of Liability provisions are separately recited below.

substantially the same general conditions shall be considered as arising out of one occurrence.

The four policies define the term "occurrence" in substantially the same way: "Occurrence means an accident, including continuous or repeated exposure to a condition, which results in bodily injury or property damage neither expected or intended from the standpoint of the insured."

As noted above, the Declarations page of each Policy states the limit of Zurich's liability against each coverage.  In the section, entitled "Limits of Liability," there is a box for the limit for "each occurrence" and a box for the "aggregate" limit of "Bodily Injury Liability." The dollar values of the limits of liability in the chart on the declarations page as to Bodily Injury Liability were listed as follows:  For the 1981-1982[4] policy, the limits of liability were listed as $500,000 in the "each occurrence" box, and "CSL" was typed in the "aggregate" box. ECF No. 687-2 at 3. For the 1982–1983 policy, the limits of liability were listed as $500,000 in the "each occurrence" box, and "CSL"[5] in the "aggregate" box.  ECF No. 687-3 at 2.  The limit stated on the Declarations page was subsequently doubled by endorsement in the 1982 Policy to "$1,000,000 COMBINED SINGLE LIMITS."  ECF No. 673-3 at 73.

The 1983-1984 policy set forth limits of liability on form GL 9916, an endorsement to the policy. ECF No. 687-4 at 41. Form GL 9916 provides: Regardless of the number of (1) insureds under  this  policy, (2) persons or organizations who sustain bodily injury or property damage, or

---

[4] This policy had an initial term of 2/4/1980 to 2/4/1981 and was renewed for the period of 2/4/1981 to 2/4/1982. Fluor became a stockholder of St. Joe in 1981.
[5] "Combined single limits" or "CSL" simply means that multiple types of claims (e.g. bodily injury or property damage) share one set of limits. *See generally* Croskey et al., Cal. Practice Guide: Ins. Litigation, Ch. 7A-J Policy Limits (The Rutter Group, 2017), § 7:348

(3) claims made or suit brought on account of bodily injury or property damage, the Company's liability is limited as follows ...

> (a) The limit of liability stated in the Schedule of this endorsement as applicable to "each occurrence" is the total limit of the company's liability for all damages including damages for care and loss of services because of bodily injury and property damage sustained by one or more persons or organizations as a result of any one occurrence ...
>
> (b) If an aggregate amount is stated in the Schedule, then, subject to the above provision respecting "each occurrence," the total liability of the company for all damages because of all bodily injury and property damage which occurs during each annual period while this policy is in force commencing from its effective date, shall not exceed the limit of liability stated in the Schedule of this endorsement as "aggregate".
>
> (c) For the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* The schedule for GL 9916 indicates that the policy has limits of $1,000,000 per occurrence and $1,000,000 aggregate. *Id.*

The 1984-1985 Policy did not set forth the limits of bodily injury liability on the Declarations page. Instead, Endorsement 24 set forth limits the of liability for bodily injury (and property damage). ECF No. 687-5 at 33. This endorsement provides: "It is further agreed that the limits of the company's liability for the period 2/4/84 to 6/1/85 is amended to read $1,000,000 CSL per occurrence, $1,321,000 aggregate." *Id.*

## Personal Injury Liability Provisions

With respect to the separate personal injury coverage, all four Policies provided in substantially the same way that Zurich:

> will pay on behalf of the Insureds all sums which the Insureds shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named Insured's business:
> Group A—false arrest, detention or imprisonment, or malicious

prosecution;

Group B—the publication or utterance of a libel or slander . . .

Group C—wrongful entry or eviction, or other invasion of the right
of private occupancy.

*See* ECF Nos. 687-2 at 14, 687-3 at 18; 687-4 at 28, 687-5 at 44.  In the 1982, 1983, and 1984

Policies, endorsements amended the definition of "personal injury" "to include[] but is not

limited to bodily injury, mental injury, mental anguish, pain, shock, sickness or disease sustained

by any person which occurs during the policy period, including death at any time resulting

therefrom." ECF Nos. 687-3 at 78, 687-4 at 75, 687-5 at 30.

The coverage part with respect to personal injury liability then stated:

Regardless of the number of (1) Insureds under this policy, (2) persons or organizations
who sustain personal injury, or (3) claims made or suits brought on account of personal
injury, the total limit of the company's liability under this coverage for all damages shall
not exceed the limit of personal injury liability stated in the schedule as "aggregate".

*See* ECF Nos. 687-2 at 14, 687-3 at 18; 687-4 at 28, 687-5 at 44. The Policy Limits for personal

injury liability were reflected by endorsement in each Policy as follows: $500,000 aggregate in

the 1981-1982 Policy; $500,000 aggregate in the 1982-1983 Policy; $1,000,000 aggregate in the

1983-1984 Policy; and $1,000,000 aggregate in the 1984-1985 Policy.

## V.   DISCUSSION

In its motion, Fluor argues the amount of available policy limits should not be in

reasonable dispute. Fluor contends the Policies' plain language confirms each Bronson/Smoger

plaintiff triggered a separate bodily injury coverage limit under each of the Zurich policies at

issue. Fluor asserts each Zurich Policy specifies an amount of coverage available for "bodily

injury" claims, which are expressed on a **"per claim"** basis in the 1981 and 1982 Policies, and

on a "per occurrence" basis in the 1984 Policy.[6]  Fluor argues each covered plaintiff in the Bronson/Smoger lawsuits constitutes a *separate occurrence* as the "immediate cause" of each plaintiff's bodily injury was different as each plaintiff was exposed to lead in different ways, at different times, and at different places. Fluor also argues the 1981 and 1982 Policies do not have aggregate limits for bodily injury.  Applying its interpretations, Fluor contends there was at least $43.5 million available to settle for Fluor and at least $46 million to settle for Doe Run and Fluor together. Fluor also asserts each of the Zurich Policies specifies an amount of coverage available for "personal injury" claims and therefore 2.5 million was available to settle the Bronson/Smoger suits.[7]

In its response, Zurich disputes Fluor's argument each Bronson/Smoger plaintiff triggered a separate bodily injury coverage limit under the Policies. Zurich argues Fluor relies on incorrect readings of inapplicable policy provisions for its proposition the 1981 and 1982 Policies state coverage for bodily injury on a "per claim" basis.  Zurich contends the policy terms are unambiguous and establish coverage for bodily injury is subject to a per occurrence limit of liability. Zurich also disputes Fluor's contention each covered plaintiff constitutes an occurrence as the immediate cause of each of their injuries was unique.  Zurich argues there was one cause of the damages alleged by every plaintiff: the operation of the Doe Run smelter.

---

[6] Fluor does not argue in its motion that coverage is available or applicable under the 1983-1984 Policy. There is evidence of record Doe Run deemed the 1983 Policy exhausted in 2010, and it appears to the Court Fluor may take the same position. However, Fluor offers no explanation for its omission. Fluor mentions the 1983-1984 Policy in a footnote arguing the 1983 Policy is the only one of the four Zurich Policies with an endorsement including an aggregate limit for bodily injury claims.  Fluor notes the relevance of the 1983 Policy to its motion here is to show Zurich knew how to state an aggregate limit, if it wished to, for the type of bodily injury claims at issue in the Bronson-Smoger lawsuits. As the Court is determining policy limits at issuance, it will consider the 1983-1984 Policy in its analysis.

[7] Fluor excludes the personal injury liability Policy limits for the 1983-1984 Policy from its total.

Zurich maintains the injuries alleged by the Bronson-Smoger plaintiffs arose out of "continuous or repeated exposure to the same general conditions"–lead pollution from the smelter in Herculaneum–and the Court should find that there was a single occurrence under the Policies.  In opposition to Fluor's argument the 1981, 1982, and 1983 Policies have no aggregate limits, Zurich argues each Policy was subject to an aggregate for bodily injury damage.  Finally, Zurich argues none of the Bronson/Smoger plaintiffs alleged personal injury claims and therefore personal injury limits are not applicable here.  Based upon these arguments, Zurich contends the policy limits at issuance for the Zurich Policies were $3,500,000 in total.

Thus, the following issues require resolution from the Court: 1) whether the amount of coverage available for "bodily injury" claims is expressed on a "per claim" or "per occurrence" basis in the 1981 and 1982 Policies; 2) whether each covered plaintiff constitutes an occurrence or the plaintiffs' bodily injuries arose from a single occurrence under the Policies; 3) whether the Policies contain aggregate limits for bodily injury; and 4) whether the Bronson/Smoger plaintiffs alleged personal injury claims.

In interpreting an insurance contract, we must keep in mind that insurance policies are contracts; thus, the rules of contract construction apply. *Am. Fam. Mut. Ins. Co. v. St. Clair*, 295 S.W.3d 586, 591 (Mo. Ct. App. 2008). The words of a policy must be given their plain and ordinary meaning consistent with the reasonable expectation and objectives of the parties, unless it is obvious that a technical meaning was intended. *Standard Artificial Limb, Inc. v. Allianz Ins. Co.*, 895 S.W.2d 205, 209 (Mo. Ct. App. 1995); *Krombach*, 785 S.W.2d at 731. We read insurance policies as a whole to determine the parties' intent and give effect to this intent by enforcing the contract as written. *Dibben v. Shelter Ins. Co.*, 261 S.W.3d 553, 556 (Mo. Ct. App. 2008). We must endeavor to give each provision a reasonable meaning and to avoid an

interpretation that renders some provisions useless or redundant. *Wildflower Cmty. Ass'n, Inc. v. Rinderknecht*, 25 S.W.3d 530, 534 (Mo. Ct. App. 2000).

The mere fact that the parties disagree over the interpretation of the terms of a contract does not create an ambiguity. *Stotts v. Progressive Classic Ins. Co.*, 118 S.W.3d 655, 662 (Mo. Ct. App. 2003).  A policy provision is ambiguous "when there is duplicity, indistinctness, or uncertainty in the meaning of the language" that leaves the provision "reasonably open to different constructions."  *Burns v. Smith*, 303 S.W.3d 505, 512 (Mo. 2010).

### **Fluor's Per Claim Argument**

Fluor contends Zurich's "one occurrence" argument has no bearing on the 1981 and 1982 Policies, since these Policies provide separate limits for each person's claim alleging injury during the Policy periods. Although on the Declarations page of the 1981 Policy, the limits of liability for bodily injury were listed as $500,000 in the "each occurrence" box, Fluor argues this bodily injury liability limit was amended by Endorsement number 7 to "500,000 EACH CLAIM."  Endorsement number 7 states:

> LIMITS OF LIABILITY FOR COMPREHENSIVE GENERAL LIABILITY AS DESIGNATED UNDER ITEM 3 OF THE POLICY DECLARATIONS IS AMENDED TO READ:
>
>> 500,000 EACH CLAIM
>>
>> 500,000 EACH AGGREGATE AS RESPECTS INCIDENTAL PROFESSIONAL
>>> LIABILITY ENDORSEMENT.

ECF Nos. 687-2 at 26; 687-3 at 31.

Although Endorsement number 7 provides clear reference to incidental professional liability, Fluor contends the "500,000 EACH CLAIM" amends the 500,000 *per occurrence* bodily injury limit on the Declarations form. In support of this conclusion, Fluor relies on an unrelated endorsement in the 1981 Policy pertaining to the insured's deductible obligation. This

endorsement states the *insured's deductible* was on a *per claim* basis applied to each bodily

injury sustained by a person.  ECF No. 687-2 at 17 (emphasis added).  Comparing the use of the

phase *per claim* in the deductible endorsement with the similar phrase "EACH CLAIM" utilized

in Endorsement number 7, Fluor concludes "EACH CLAIM" must apply to bodily injury as

well.  As such, Fluor argues bodily injury limits are "per claim," not "per occurrence," and

therefore, it follows that the 1981 Policy provides $500,000 to settle with *each* Bronson-Smoger

plaintiff who allegedly suffered bodily injury during the policy period.

Fluor notes the exact same Endorsement number 7 was present in the 1982 Policy and

again contends the "500,000 EACH CLAIM" endorsement amended the bodily injury limit of

"$500,000" for "each occurrence" on the Declarations page of the 1982 Policy.  Fluor further

argues "500,000 EACH CLAIM" in Endorsement number 7 in the 1982 Policy was amended by

Endorsement 33 in the same Policy, which amended the bodily injury liability limit to

"$1,000,000 COMBINED SINGLE LIMITS."  ECF No. 673-3 at 73. Therefore, Fluor

concludes, because the bodily injury limits were amended to be "per claim," the 1982 Policy

provides $1,000,000 to settle with each Bronson/Smoger plaintiff who allegedly suffered bodily

injury during the 1982 policy period.

As noted above, the Court must endeavor to give each provision in the Policies a

reasonable meaning and avoid an interpretation which renders some provisions useless or

redundant. Here, in both the 1981 and 1982 Policies, the Declarations form clearly states a bodily

injury limit of $500,000 for "each occurrence." The 1981 and 1982 Policies' Declarations form

also indicates coverage for "INCIDENTAL PROF. LIA.," however, there is no box to state the

numerical value for the limit of liability on the Declarations page as there is for bodily injury

coverage. Therefore, the Declarations form states "INCL." next to "INCIDENTAL PROF. LIA."

As indicated by "INCL." on the Declarations pages, the coverage for Incidental Professional Liability was part of the 1981 and 1982 Policies via an endorsement, at issuance. These endorsements provide:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury arising out of the rendering of or failure to render, during the policy period professional services by any physician, dentist, nurse, trained medical personnel while employed or under contract by the insured to provide such services in the course of his employment.

ECF Nos. 687-2 at 32; 687-3 at 40.  While these endorsements contain terms and provisions describing coverage, they do not state the numerical value of the limits of liability.

The Court finds Endorsement number 7 in both the 1981 and 1983 Policies, sets the numerical limits of liability for the Incidental Professional Liability Endorsement, by stating:

> 500,000 EACH CLAIM
>
> 500,000 EACH AGGREGATE AS RESPECTS INCIDENTAL PROFESSIONAL
>
>        LIABILITY ENDORSEMENT.

It strains credulity to think the phrase "500,000 EACH CLAIM" would be left blank as to the type coverage it applied to, while the second phrase immediately below it for the aggregate limit specifically references an entirely different type of coverage. The Court declines to create ambiguity where none exists and will read policies as a whole.

Moreover, the two phrases ("500,000 EACH CLAIM" and "500,000 EACH AGGREGATE") follow a colon and form part of the same sentence unseparated by punctuation, indicating the modifying phrase at the end ("AS RESPECTS INCIDENTAL PROFESSIONAL LIABILITY ENDORSEMENT.") applies to both clauses.  When interpreting a contract, punctuation is to be considered to the extent it aids in interpreting the meaning of language, such as aiding in the determination of what preceding phrases or phrase is modified by a succeeding phrase. *Cf. Dry v. United Fire & Cas. Co., Inc.*, 420 S.W.3d 593 (Mo. Ct. App. 2013), reh'g

16

and/or transfer denied, (July 15, 2013) and transfer denied, (Oct. 1, 2013) (ruling that two policy requirements that are separated by a comma and a conjunction indicate that "the two requirements are separate, and the modifying phrases apply only to the requirement to which they are the closest").

The Court further finds meritless Fluor's argument that because the endorsement relating to the insured's deductible obligation stated the *deductible* for bodily injuries was on a *per claim* basis, the reference to "EACH CLAIM" in Endorsement 7 must refer to bodily injury liability as well. While the phrase "per claim" and "each claim" may have a similar meaning, it does not follow that both phrases necessarily reference bodily injury.

Finally, Fluor's interpretation of Endorsement 7 would create a conflict with the language on the Declarations page and render all the policy provisions pertaining to bodily injury meaningless as it indicates coverage is applied on a per occurrence basis.[8] "Construction of an insurance policy which entirely neutralizes one provision should not be adopted if the contract is susceptible of another construction which gives effect to all of its provisions and is consistent with the general intent." *Westchester Fire Ins. Co. v. Wallerich*, 563 F.3d 707, 712 (8th Cir. 2009).

In its Reply, Fluor further argues applying Endorsement number 7 solely to Incidental Professional Liability coverage would render meaningless the Endorsement's reference to

---

[8] The Court further notes the 1983 and 1984 Policies each contain a comprehensive endorsement (numbers 14 and 7, respectively) for incidental professional liability which includes numerical values for the limits of liability. Confirming the Court's interpretation above, the limits of liability for incidental professional liability in both the 1983 and 1984 policies are listed as "$1,000,000 *Each Claim* and $1,000,000 Aggregate." Moreover, each professional liability endorsement states "This endorsement changes such insurance as is afforded by provisions of the policy relating to the following: COMPREHENSIVE GENERAL LIABILITY." ECF No. 687-4 at 18. *See* 687-5 at 11.

"Comprehensive General Liability."[9] Although Bodily Injury is part of the Policies'

"Comprehensive General Liability" on the Declarations page, a construction giving effect to all

the Policies' provisions is incidental professional liability for bodily injuries is deemed part of

Comprehensive General Liability.  This interpretation is confirmed by the incidental professional

liability endorsements (numbers 12A,14 and 7, respectively) in the 1982, 1983 and 1984 Policies

which explicitly state: "This endorsement changes such insurance as is afforded by provisions of

the policy relating to the following:  COMPREHENSIVE GENERAL LIABILITY." ECF No.

687-4 at 18.  *See also* ECF No. 687-3 at 40; 687-5 at 11.

The Court finds the limits for incidental professional liability are stated on Endorsement

7 of the 1981 and 1982 Policies and are separate and inapplicable to bodily injury coverage as

argued by Fluor. Accordingly, the Court finds the terms of all four Policies unambiguously

establish coverage for *bodily injury* is subject to a *per-occurrence* limit of liability.

## Number of Occurrences under the Policies

The parties offer diametrically opposed arguments as to the number of occurrences under

the Policies.  Fluor asserts each Bronson/Smoger plaintiffs' injurious exposure to lead constitutes

a separate occurrence.  Zurich argues the cause of the plaintiffs' injuries was the lead smelter and

constitutes a single occurrence.

Under the Policies, "occurrence" means an accident, including continuous or repeated

exposure to a condition, which results in bodily injury or property damage.  The Limits of

Liability provisions provide that no matter how many plaintiffs sue, if their bodily injury arises

out of one occurrence, it is subject to the per occurrence limit. The Limits of Liability provisions

---

[9] As noted above, Endorsement number 7 states: "LIMITS OF LIABILITY FOR
COMPREHENSIVE GENERAL LIABILITY AS DESIGNATED UNDER ITEM 3 OF THE POLICY
DECLARATIONS IS AMENDED TO READ . . . ."

also expressly state "all bodily injury . . . arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." When determining the number of occurrences, Missouri applies a "cause" approach which examines the cause or causes of the accident or occurrence to determine whether there is a single or multiple occurrence." *See Kansas Fire & Cas. Co. v. Koelling,* 729 S.W.2d 251 (Mo. Ct. App. 1987).

Fluor acknowledges Missouri courts apply the cause approach.  Fluor concedes there is no dispute that the smelter was a cause of each plaintiff's alleged damages, but argues the smelter is not the relevant cause for purposes of assessing coverage.  Fluor argues the immediate cause of each plaintiff's injury was not the fact that the smelter emitted lead. Instead, Fluor asserts the immediate cause of each plaintiff's bodily injury turned on each plaintiff's unique exposure to separate contamination in "residential yards, church property, public parks, ball fields," "streets," "ambient air" or "soil" in and around Herculaneum. Fluor argues each of these contamination pathways created different conditions for each plaintiff, from which "continuous or repeated exposure" resulted in separate bodily injury.  Therefore, according to Fluor, each plaintiff constitutes a separate occurrence.

In opposition, Zurich argues the bodily injuries alleged by the Bronson/Smoger plaintiffs arose out of continuous or repeated exposure to the same general conditions—lead pollution from the smelter in Herculaneum. Zurich notes each of the complaints filed on behalf of the Bronson-Smoger plaintiffs allege one cause of the lead poisoning for which the plaintiffs sought damages: the Doe Run smelter.  Zurich argues under Missouri law, a single cause of the alleged damages constitutes a single occurrence.  Zurich states Fluor's focus on the way in which each

plaintiff came in contact with lead shifts the inquiry to a circumstances of the injury test from a cause of injury test.

The Court finds, under Missouri law, the Bronson/Smoger plaintiffs' injuries arose out of one occurrence. Two prevailing doctrines exist regarding interpretation of the term "occurrence" in insurance policies. Under the "cause" approach, an insured's single act is considered the accident from which all claims flow. *Fellowship of Christian Athletes v. Axis Ins. Co.*, No. 12-445-CV-W-DW, 2013 WL 12141436, at *3 (W.D. Mo. July 24, 2013), *aff'd*, 758 F.3d 982 (8th Cir. 2014). Under the "effect" approach, each claim arising out of an insured's act is considered a separate accident. *Id.* Under an" effects" analysis, policies are triggered by the occurrence of damages, not by the negligent acts. *Allstate Prop. & Cas. Ins. Co. v. McBee*, No. 08-0534CVWHFS, 2009 WL 1124973, at *3 (W.D. Mo. Apr. 27, 2009).

Here, the complaints filed on behalf of the Bronson/Smoger Plaintiffs identify only one cause of lead poisoning: The plaintiffs were exposed to lead and other toxic materials originating from the Herculaneum smelter. As an owner, Fluor was liable for the activities of the smelter. Fluor's smelter emitted lead and other toxins into the air and environment, exposing the town's residents. The lead was present in residential yards, church property, public parks, ball fields, streets, ambient air and soil in and around Herculaneum. That exposure in turn caused the Bronson-Smoger Plaintiffs to suffer lead poisoning.

Although Fluor concedes the "cause approach" must be applied in Missouri, its argument the unique nature of each plaintiff's injurious exposure constitutes an occurrence follows an "effect approach." The effects theory analyzes the incident from the point of view of the person who was injured. Fluor's analysis focuses on when and where plaintiffs' damages occurred—not the negligent actions which caused the damages. To establish multiple occurrences in Missouri,

there must be multiple causes or intervening acts of negligence. *See Kansas Fire & Cas. Co.,* 729 S.W.2d 251. Fluor's argument that each plaintiffs' injurious *exposure* constitutes a separate cause and occurrence applies an effects test and fails as a matter of law in Missouri law.

The Policies' language is unambiguous an occurrence includes repeated or continuous exposure to conditions. Here, the plaintiffs alleged continuous and repeated exposure to lead contamination. Under the Policies' language, if all the Bronson/Smoger plaintiffs' bodily injuries arise out of one occurrence, they are subject to the per occurrence limit. The Limits of Liability provision expressly states all bodily injury *arising out of* continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence. Applying the language of the Policies under the cause approach in Missouri, the relevant question therefore is whether the Bronson/Smoger plaintiffs' bodily injuries arose out of the operation of the smelter.

Under Missouri insurance law, "arising out of" has been interpreted "to be a very broad, general and comprehensive phrase" meaning "originating from" or "having its origins in" or "growing out of" or "flowing from." *Colony Ins. Co. v. Pinewoods Enters., Inc.,* 29 F.Supp.2d 1079, 1083 (E.D. Mo.1998) (citations and quotations omitted). The phrase "arising out of" is more expansive than the words "caused by" used in some policies. *Id.* When the former phrase is used in a liability policy, an unbroken chain of events need not be established but rather a simple casual relationship must exist between the accident or injury and the activity of the insured. *Id.* When this phrase is used, the applicable causation standard is not the strict "direct and proximate cause" standard applicable in general tort law. *Capitol Indem. Corp. v. 1405 Assocs., Inc.*, 340 F.3d 547, 550 (8th Cir. 2003) (citing *Colony Ins. Co.,* 29 F.Supp.2d at 1083).

Fluor argues the Missouri courts broad interpretation of the phrase "arising from" does not establish the plaintiffs' damages arose from a source as remote as the smelter. As an analogy, Fluor notes the Mississippi River "originates" at Lake Itasca, in Minnesota. Yet if a person jumped into the Mississippi near the courthouse in St. Louis, Fluor points out it would not be Lake Itasca that caused her to get wet, even though the river ultimately "flows from" there. Setting aside the recklessness of any individual willing to jump into the Mississippi in downtown St. Louis, the Court cannot agree the emission of lead from the smelter into the neighboring Herculaneum community was as attenuated a journey as the water from Lake Itasca flowing to St. Louis.  However, continuing with the analogy the Court notes, as *Kansas Fire & Cas. Co. v. Koelling* instructs, an intervening negligent act may give rise to a second occurrence.  729 S.W.2d at 252.  It is undisputed water from numerous other states and waterways, including the Missouri River, drains into the Mississippi between Lake Itasca and St. Louis–its flow is not unbroken by intervening causes.

Here in contrast, there are no intervening acts of negligence alleged to have caused plaintiffs' injuries—just different pathways taken by the lead after being negligently emitted from its source. The Court finds the relationship required under Missouri law between the smelter's emission of lead and the plaintiffs' injuries is established.  The lead poisoning suffered by plaintiffs flowed from, originated from, and arose out of the operation of the smelter.

Fluor argues a single occurrence position is not supported as Missouri courts recognize distinct causes of contamination arising from industrial operations necessarily constitute separate occurrences.  Fluor relies on *Doe Run Res. Corp. v. Certain Underwriters at Lloyd's London*, 400 S.W.3d 463 (Mo. Ct. App. 2013) for its proposition. In *Doe Run Res. Corp.*, 400 S.W.3d at 475–76, Doe Run sought coverage against its excess liability insurer to pay costs to

remediate environmental damage from mining, chat piles and tailings ponds. *Id.* at 466. Six sites were involved. *Id.*  After a seven-day trial, the trial court rejected the jury's award of coverage damages to Doe Run for its environmental property damage liability, and instead reduced the verdict based on its ruling "as a matter of law that there was no more than one occurrence per site." *Id.* at 475. The Missouri Court of Appeal reversed.  *Id.* at 476.  According to the Court of Appeal, "there were three occurrences at each site in active operation during the policy period— active operations, chat piles, and tailings ponds—and two occurrences at inoperative sites—chat piles and tailing ponds." *Id.*

The Court of Appeals reasoned the active contamination, tailings ponds, and chat piles, constituted separate and distinct causes of contamination which resulted in separate occurrences. *Id.* The Court of Appeals noted the chat piles and tailings ponds were physically distinct with different migration profiles. *Id.*  They were also located at different areas around the mills and were sometimes miles apart. *Id.*  The Court observed the EPA had recognized chat piles, tailings ponds, and active operations were separate causes of damage to the environment and required different remediation techniques for each.  *Id.*

Fluor argues because the smelter similarly involved numerous pathways for causing injury, a single occurrence interpretation of the Policies is unreasonable.  The Court disagrees and finds *Doe Run Res*. distinguishable.  In *Doe Run Res.*, the claims involved discrete damage to property, not bodily injury, and the EPA had previously determined chat piles, tailings ponds, and active operations sites were the distinct sources of the contamination damage to the property. The Court of Appeals focused on the significance of separate locations and physical distinctions in finding multiple occurrences. Moreover, where active contamination took place (at 4 of the 6 sites), the Court of Appeals deemed the active operations one occurrence for the site and did not

23

look to find additional occurrences based on the pathways of the active contamination.  The Court finds this case inapposite.

Accordingly, as noted above, the Court finds, under Missouri law, the Bronson/Smoger plaintiffs' injuries arose out of one occurrence and are subject to the per occurrence limit.

### Aggregate Limits

The Court determined above under Missouri law, the Bronson/Smoger plaintiffs' injuries arose out of one occurrence.  In the absence of multiple occurrences, the Court need not reach the question of whether the four Polices stated aggregate limits for Bodily injury and Property damage.

### Personal Injury Liability Limits

Based upon the plain language of the endorsements contained in all four Policies, the Court finds the 1981 and 1982 Policies each provide a $500,000 Aggregate limit for personal injury liability. ECF Nos. 687-2 at 13; 687-3 at 30. The 1983 and 1984 Policies each provide a $1,000,000 Aggregate limit for personal injury liability. ECF Nos. 687-4 at 28; 687-5 at 44. Collectively, the four Policies provide a total of $3 million in "personal injury" liability limits subject to an aggregate.

In a footnote of its motion, Fluor asserts the Policies' limits for personal injury liability were available to Zurich at the time of the crucial mediation. Fluor contends the Policy limits for personal injury may be added to the total policy proceeds that could have been used to settle for Fluor when the opportunity arose in late 2010.  In its Reply, Fluor clarifies each of the Bronson/Smoger complaints included a "Trespass" claim, which was alleged to have caused injuries falling under the Policies' definition of "personal injury." Fluor further argues as

evidence that the Bronson/Smoger plaintiffs allegations triggered the personal injury coverage, Zurich paid the full "personal injury" coverage to Doe Run in 2012.

In response, Zurich disputes the Bronson/Smoger plaintiffs alleged personal injury claims.  Although the definition of "personal injury" was amended by endorsement in 1982 to include bodily injuries sustained by a person, Zurich argues the "personal injury" must still be caused by one of the enumerated offenses[10] and does not create stand-alone coverage for bodily injury. Zurich asserts the Bronson/Smoger claims do not fit into any of the categories of offenses to which personal injury liability applies.  To the extent Fluor contends the "Trespass" claims in the Bronson/Smoger complaints constitute the enumerated offense of "invasion of the right of privacy," Zurich argues there is no evidence the plaintiffs owned or rented real property upon which the lead smelter's emissions trespassed as they were children.

Up until the briefing of this motion, the Court was under the impression only bodily injury claims were at issue with regard to the Bronson/Smoger plaintiffs.[11]  However, the Court notes the Bronson/Smoger complaints do include allegations of trespass, which may trigger coverage for a personal injury caused by an enumerated offense as set forth under the Policies.[12]

---

[10] Per the Policies' language, the enumerated offenses include: Group A—false arrest, detention or imprisonment, or malicious prosecution; Group B—the publication or utterance of a libel or slander . . . Group C—wrongful entry or eviction, or other invasion of the right of private occupancy.

[11] The Court does note the record reflects Zurich claimed its personal injury limits were exhausted by an indemnity payment for *Doyle, et al. v. The Doe Run Res., Corp.*, Case No. 012-8641, and *other payments* made by Zurich for personal injury coverage. However, *Doyle* was a Gray Ritter Graham case, not a Bronson/Smoger case.  Zurich's complaint alleges *Doyle* was also a property damage class action. The Court cannot conclude personal injury liability is implicated by the Bronson/Smoger claims based on Zurich's payment related to *Doyle*.

[12] See *Royal Ins. Co. of Am. v. Kirksville Coll. of Osteopathic Medicine*, 191 F. 3d 959 (8th Cir. 1999) (court held insurers have a duty to defend insured based on the personal injury provisions in the policies as third-party claimant's claim of trespass falls within the "wrongful entry" and "invasion of the right of private occupancy" provisions of the policies' personal injury sections).

Although Zurich argues there is insufficient evidence to establish trespass, whether the Bronson/Smoger plaintiffs could prove their allegations is not at issue here. Moreover, there is evidence of record personal injury liability was deemed exhausted with regard to the Herculaneum claims (of which the Bronson/Smoger claims are a subset) by the 2012 settlement between Zurich and Doe Run. *See* ECF No. 516-14 at 6.  The Court further notes Zurich's fourth cause of action itself seeks a declaration the Zurich Policies were exhausted by virtue of the Global Settlement with regard to the Herculaneum Claims and the personal injury coverage in the Zurich Policies. Fluor's motion will be granted in this respect. Subject to establishing at trial that personal injury claims are not at issue with regard to the Bronson/Smoger plaintiffs, the Court will include the $3 million "personal injury" liability limits to the total Policy limits available at issuance.

## VI.    JUDICIAL NOTICE

Both parties have filed notices of requests for judicial notice in connection with the motion to determine policy limits. Fluor asks the Court to take judicial notice of six documents. Four documents are publicly available filings and a notice of ruling from prior litigation involving Doe Run and Zurich.  Two documents are publicly available filings from prior litigation involving Zurich. Fluor's request is uncontested by Zurich.

Zurich again requests that the court take judicial notice of the Missouri Court of Appeals' opinion in *Blanks v. Fluor Corp.*, 450 S.W.3d 308 (2014) ("*Blanks*").  Fluor opposes Zurich's request, arguing summaries of facts in the *Blanks* opinion that Zurich asks the Court to rely on to establish their truth do not meet the criteria for judicial notice under Federal Rule of Evidence 201. Previously, the Court, in denying the Rule 16 motion before it, declined to take notice of adjudicated facts from *Blanks*.

Under Federal Rule of Evidence 201, the Court may take judicial notice of information "not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Judicial notice of another court's opinion takes notice of "the existence of the opinion, which is not subject to reasonable dispute over its authenticity," but not of the facts summarized in the opinion. *McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014). However, under Federal Rule of Evidence 201, "a court may take judicial notice of an adjudicative fact as long as such a fact 'is not subject to reasonable dispute....'" *Colony Ins. Co. v. Frison Flea Mkt. Inc.*, No. 4:13CV2193 JCH, 2014 WL 4670908, at *1 (E.D. Mo. Sept. 18, 2014) (quoting Fed. R. Ev. 201(b)). Judicial notice may be taken at any stage of litigation. Fed. R. Ev. 201(d).

Here, the Court takes judicial notice of the 6 documents supplied by Fluor. The Court will also take judicial notice of the *existence* of the judicial opinion *Blanks*. Zurich's request also seeks judicial notice of the *Alexander* trial court's fact findings–as summarized on appeal in *Blanks*. Specifically, Zurich seeks notice of specific findings that the smelter continually emitted lead into the air which settled on the soil of the nearby community and found its way into the children's homes and into the children. That the source of the lead contamination was the continuous operation of the smelter is not reasonably in dispute in this action. In its response to Zurich's statement of additional facts, Fluor concedes there is no dispute that the smelter was a (remote) cause of each plaintiff's alleged damages. ECF No. 710-2 at 9. Fluor's motion to determine policy limits states the smelter necessarily involved numerous distinct pathways for causing injury, including "residential yards, church property, public parks, ball fields," "streets," "ambient air" and "soil" in and around Herculaneum which caused the bodily injury damages at

issue in the Bronson-Smoger lawsuits.  ECF No. 683-23-24.  Also, in its motion, Fluor notes the

facts in *Blanks* underscore Fluor's argument as the *Blanks* Court recognized each plaintiff was

exposed to lead at various times, in different places, and under different conditions.

The Court does not find the findings in *Blanks* recited above to be subject to reasonable

dispute.  Accordingly, Court takes judicial notice of these facts. The Court notes its ruling does

not extend to other adjudicated facts in the 180-page *Blanks* opinion as the Court has not

undertaken an analysis as to whether these additional facts are in reasonable dispute in this

litigation.

## VII.    CONCLUSION

The Court finds, under Missouri law, there is no genuine issue of fact and judgment is

appropriate as a matter of law that the Bronson/Smoger plaintiffs' injuries arose out of one

occurrence and are subject to the per occurrence limit. For the 1981-1982 policy, the limits of

liability were listed as $500,000 in the "each occurrence" box. For the 1982–1983 policy, the

limits of liability were listed as $1,000,000 for "each occurrence."  For the 1983–1984 policy,

the schedule for GL 9916 indicates the policy has limits of $1,000,000 per occurrence.  Finally,

for the 1984-1985 policy, Endorsement 24 indicates the policy limits were $1,000,000 CSL per

occurrence.  Thus, the Court determines, as a matter of law, the policy limits at issuance of the

Zurich policies were $3,500,000.  The Court has also determined that the personal injury liability

limits at issuance were $3,000,000.

Accordingly,

**IT IS HEREBY ORDERED** that Fluor Corporation's Notice of Motion to determine

Policy Limits [681] is **GRANTED in part and DENIED in part**.

**IT IS FURTHER ORDERED** that summary judgment will be **GRANTED** in favor of non-movant Zurich as to the determination of the Policies' limits at issuance for Bodily Injury as set forth above.

Dated this 25th Day of July 2021.

_E. Richard Webber_
_____
E. RICHARD WEBBER
SENIOR UNITED STATES DISTRICT JUDGE