UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| FLUOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16CV429HEA |
| | ) | |
| ZURICH AMERICAN INSURANCE | ) | |
| COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant Zurich's Motion to Determine the Applicable Policy Limits as a Matter of Law, [Doc. No. 798]. The parties have submitted memoranda in support of their respective positions. For the reasons set forth below, Defendant's Motion will be denied.

### Facts and Procedural Background

The sole remaining claim in this case is Plaintiff's bad faith refusal to settle within the policy limits of insurance policies issued by Zurich. This motion arises because on April 13, 2023, the Eighth Circuit Court of Appeals entered its Opinion reversing Judge Webber's ruling that Zurich's insurance policies were limited on a per-occurrence basis. When analyzed on a per-occurrence basis, there is no question the limits of liability have been exhausted by initial settlement payments. The Appellate Court remanded the case for further proceedings consistent with the

views set forth in the Court's Opinion.

The factual background has been extensively set out throughout this proceeding.  In his July 25, 2021 Memorandum and Order, Judge Webber detailed the underlying facts giving rise to this declaratory judgment action:

> Beginning in the 1990s, residents of Herculaneum, Missouri started bringing lawsuits against Doe Run, Fluor, and other defendants. The plaintiffs in those cases claimed they had suffered bodily injury caused by the Herculaneum lead smelter. From 2002-2011, attorneys Mark Bronson and Gerson Smoger filed a number of these lawsuits (the "Bronson/Smoger lawsuits") on behalf of plaintiffs alleging liability against Doe Run and Fluor based upon claims of bodily injury caused by exposure to lead, metals and other toxic substances from the smelter.
>
> Fluor owned the smelter from 1981 to 1994. Between February 4, 1981, and June 1, 1985, Zurich issued four commercial general liability insurance policies to St. Joe Minerals Fluor owned as its sole stockholder). During the relevant years of the Policies the Herculaneum lead smelter operated continually, emitting lead into the air and environment which settled on the soil of the nearby community. The lead was present in residential yards, church property, public parks, ball fields, streets, ambient air and soil in and around Herculaneum. The Bronson/Smoger plaintiffs' continuous or repeated exposure to this lead caused bodily injury damages.
>
> In their complaints, the Bronson-Smoger Plaintiffs generally made the following allegations:
>
> > • At all relevant times, Plaintiffs are either residents or former residents of Herculaneum, Missouri, who were exposed to lead, metals, and other toxic substances released from and/or originating in the Doe Run Smelter . . . located in Herculaneum, Missouri.
> >
> > • During the course of its operations, and at all times relevant hereto, the Doe Run Smelter mined, smelted, generated, released, dumped, deposited, and placed into the air, the environment, and onto and in and beyond the plant boundaries, including the air, land, soil, streets, property and environment of Herculaneum and surrounding

communities, lead, and other toxic metals and substances.

• The Missouri Department of Health declared Herculaneum's lead contamination caused by the Doe Run Smelter to be a clear and present and imminent and substantial endangerment to the citizens of Herculaneum, especially young children and pregnant women, citing the recent discovery of extremely elevated levels of lead contamination on some streets, yards, and play areas in Herculaneum.

• Results of soil and environmental lead tests demonstrated high, dangerous and hazardous lead levels in residential yards, public properties, inside residential homes including the bedrooms of children, and other areas in and around Herculaneum.

• Human exposure to lead, metals, and other toxic substances released into the environment by The Doe Run Smelter, and the Doe Run defendants, and each of them, causes lead poisoning which can cause physical and personal injuries, including, but not limited to, permanent brain damage and neurological abnormalities, learning disability, loss of memory, headache, insomnia, weight loss, hyper-irritability, muscle weakness and paralysis, joint pain, metallic taste, nervous system disturbances, aphasia, anemia, trembling, degenerative disease of the brain, kidney damage, peripheral neuropathy, convulsions, coma, cancer of the respiratory tract, reproductive dysfunction, and death.

• As a direct and proximate result of the wrongful acts and conduct of the defendants, and each of them, hereinafter alleged, each of the plaintiffs herein have had, and/or have, elevated levels of lead in their body, and each of the plaintiffs herein have suffered, continue to suffer, and will in the future suffer, from lead poisoning and from exposure to the lead, metals and other hazardous and toxic substances described herein.

In his September 21, 2020 Memorandum and Order, Judge Webber further found the following facts.

Zurich issued a series of comprehensive general liability policies that cover

periods from March 15, 1981, through June 1, 1985 (collectively, the "Zurich

Policies"). ECF No. 381 at ¶ 1; ECF No. 396 at ¶ 1; ECF No. 395. The Zurich

Policies were issued to St. Joe Minerals Corp. ("St. Joe"). Each of the Zurich

Policies provide that a "stockholder" of St. Joe is a "Person Insured" under the

policy. Fluor owned St. Joe during the policy periods from 1981-1985.  In 1994,

Fluor sold its interest in St. Joe to the Renco Group, Inc., which renamed the

company The Doe Run Resources Corporation ("Doe Run"). ECF No. 1 at ¶ 7;

ECF No. 42 at ¶ 8.

    Each of the Zurich Policies provide in relevant part, that Zurich:

> shall have the right and duty to defend any suit against the insured seeking
> damages on account of such bodily injury or property damage, even if any of
> the allegations of the suit are groundless, false, or fraudulent, and may make
> such investigation and settlement of any claim or suit as it deems expedient.

ECF No. 381 at ¶ 2. The Zurich Policies also provide that the insured "shall not,

except at his own cost, voluntarily make any payment, assume any obligation or

incur any expense." *Id*. at ¶ 3.1 The Policies state that Zurich:

> will pay on behalf of the insured all sums which the insured shall become
> legally obligated to pay as damages because of
> A. bodily injury or
> B. property damage
> to which this insurance applies, caused by an occurrence[.]

*Id.* at ¶ 4.

    From 2002-2011, various lawsuits were filed by attorneys Mark Bronson

and Gerson Smoger on behalf of plaintiffs ("Bronson/Smoger lawsuits") and

alleged liability against defendants, including Fluor and Doe Run, based on claims of bodily injury to various residents and children of Herculaneum, Missouri, caused by exposure to lead, metals and other toxic substances from the Doe Run Smelter, located in Herculaneum, Missouri. ECF No. 388 at ¶¶ 1-6; ECF No. 396 at 5-22.2 During 2002 and 2003, Fluor tendered the Bronson/Smoger lawsuits captioned Warden, et al. v. Fluor Corporation, et al., Browning, et al. v. Fluor Corporation, et al., and Johnson, et al. v. Fluor Corporation, et al., to Zurich for a "full and complete defense" under each of the Zurich Policies. ECF No. 396 at ¶¶ 8-10. On September 5, 2005, Fluor and Doe Run tendered eight lawsuits, including Alexander, et al. v. Fluor Corporation, et al., Heilig, et al. v. Fluor Corporation, et al., Pedersen, et al. v. Fluor Corporation, et al. (the "Alexander/Pedersen/Heilig Litigation") to Zurich for a "full and complete defense" under the Zurich Policies. ECF No. 396 at ¶¶ 11-18. In 2009, 2010, and 2011, three additional Bronson/ Smoger lawsuits (James, et al. v. Fluor Corporation, et al., Reece, et al. v. Fluor Corporation, et al., and Faulkner, et al. v. Fluor Corporation, et al.) were tendered by Fluor to Zurich for a "full and complete defense" under the Zurich Policies. ECF No. 381 at ¶¶ 12-14; ECF No. 396 at ¶¶ 19-22. In the tender letters sent to Zurich on behalf of Fluor for the Bronson/Smoger Lawsuits, Fluor designated Armstrong Teasdale as its independent defense counsel. ECF No. 388 at ¶ 7. Doe Run also tendered the Bronson/Smoger suits to Zurich, and designated Lewis Rice

as its independent defense counsel. *Id*. at ¶ 8.

Zurich agreed to defend Fluor and Doe Run in the Bronson/Smoger suits pursuant to a reservation of rights. ECF No. 381 at ¶¶15-24; ECF No. 388 at ¶ 9. Zurich reserved its right to disclaim coverage by way of certain enumerated exclusions. See ECF No. 388 at ¶¶ 10-19. For example, Zurich expressly disclaimed its defense and indemnity obligations under any Zurich Policy for the claims asserted by any named plaintiff not born or otherwise exposed to any alleged contaminants before February 4, 1985. *Id*. at ¶ 13.

In addition, among the rights Zurich reserved in connection with the Bronson/Smoger lawsuits, Zurich asserted that coverage was "not available if and to the extent that any insured has failed to satisfy any of the conditions precedent to coverage set forth in the Zurich/St. Joe policies," including "the duty to refrain from making voluntary payments or voluntarily assuming obligations (except at its own expense)." ECF No. 381 at ¶ 25. The Bronson/Smoger reservation of rights letters further stated that "Zurich reserves the right to withdraw from its agreement to defend Fluor and/or to seek to extinguish any alleged defense obligation if it becomes apparent that there is no potential for coverage of any of the claims asserted . . . ." See ECF No. 395, Exhs. 72-73, 91-103.

Through November 2010, the pattern and practice for settlements of Bronson/Smoger lawsuits was that Doe Run, with contribution from Zurich, would

settle the cases and secure releases from the settling plaintiffs on behalf of Doe Run and Fluor. ECF No. 388 at ¶ 61. Doe Run's independent defense counsel, Andrew Rothschild at Lewis Rice, took the lead on negotiating settlements with the Bronson/Smoger plaintiffs. ECF No. 388 at ¶ 30. Zurich did not communicate directly with Doe Run or Fluor (or their independent defense counsel). ECF No. 388 at ¶ 24; ECF No. 426 at ¶ 24. Instead, communications took place through each insured's coverage counsel. *Id.* Nor did Zurich's representatives communicate directly with the Bronson/Smoger plaintiffs' counsel. ECF No. 388 at ¶ 66.

In prior mediated Bronson/Smoger settlements, at Doe Run's request, Zurich would agree to fund those plaintiffs who alleged exposure during the Zurich policy periods. ECF No. 388 at ¶ 62. Doe Run funded the remaining plaintiffs' settlements. *Id*. Fluor did not contribute to the settlements of the Bronson/Smoger Lawsuits. *Id.* at ¶ 40. Fluor's position was that it was not required to contribute as it was either indemnified by Doe Run or covered by insurance. *Id*. at ¶ 40; ECF No. 426 at ¶ 40.

In 2009, Doe Run challenged Fluor's position of non-payment. During the 2009 mediation, which resulted in settlement of the Bronson/Smoger cases referred to as the Browning/Dawson cases, Doe Run demanded Fluor contribute to Doe Run's settlement offer, or risk being carved out. ECF No. 388 at ¶ 49. Although

Fluor refused to contribute, Zurich contributed funding and Doe Run included Fluor in the 2009 Browning/Dawson settlement. *Id.* at ¶¶ 50, 51.

In 2010, Doe Run again sought contribution from Fluor in order to globally settle the remaining Bronson/Smoger lawsuits. ECF No. 388 at ¶ 38. Doe Run informed Fluor of the plaintiffs' global settlement demand of $60 million, Doe Run's global settlement offer of $42 million (and, later, Doe Run's increased offer of $44 million). ECF No. 388 at ¶¶ 96, 97; ECF No. 392-1, Ex. 7, 90: 2-9. On October 18, 2010, Andy Rothschild, Doe Run's independent defense counsel at Lewis Rice, called Jack Quinn, Fluor's independent defense counsel at Armstrong Teasdale, to inform him November 18, 2010, was the scheduled date for the Bronson/Smoger mediation. ECF No. 408-27 at 7. Mr. Rothschild again requested contribution from Fluor to any settlement that might be reached. ECF No. 408 at ¶ 98; ECF No. 408-27 at 7.

He also informed Mr. Quinn that Zurich was not an impediment to Fluor making a contribution because Zurich had denied coverage for 38 of the 58 plaintiffs. ECF No. 408 at ¶ 98; ECF No. 408-27 at 7. Although Doe Run continued to seek Fluor's contribution, three days prior to the scheduled mediation, Flour told Doe Run that it should "not expect financial participation from Fluor" at the upcoming mediation. ECF No. 388 at ¶ 99; ECF No. 392-1, Ex. 656; ECF No. 392- 1, Ex. 660.

Doe Run also informed Zurich of the scheduled November 18, 2010 mediation and plaintiffs' $60 million demand. ECF No. 381 at ¶¶ 35, 36. In response to Doe Run's notification, Zurich requested information from Doe Run relating to the Bronson/Smoger plaintiffs to determine the reasonable settlement value for those plaintiffs potentially covered under the Policies. ECF No. 388 at ¶¶ 113-16.

In October 2010, Doe Run's coverage counsel, Marc Halpern, proposed a funding mechanism for the global settlement of the Bronson-Smoger Lawsuits to Zurich that would include a release for both Fluor and Doe Run. ECF No. 381 at ¶ 39. Under Doe Run's proposal, Zurich would front 50% of any settlement that may be negotiated in connection with the upcoming mediation, while reserving the right to seek reimbursement for any contributions that did not fall within Zurich's indemnity obligation. *Id.*

Prior to mediation, on November 7, 2010, Randy Sinnott, Zurich's coverage counsel (in an email to various individuals at Zurich), addressed Doe Run's funding proposal. ECF No. 381 at ¶ 40; ECF No. 382-67. Coverage counsel concluded 21 of the 58 Bronson-Smoger plaintiffs were covered plaintiffs. ECF No. 382-67 at 5. And for these 21 plaintiffs, coverage counsel determined $19,913,791 was a "reasonable settlement value." *Id*. at 7-8. Coverage counsel further stated Zurich's available policy limits were $45 million. *Id*. at 7. Zurich's

coverage counsel recommended Zurich accept Doe Run's funding proposal, and noted it was unlikely Doe Run could fund a global settlement on its own. ECF No. 381 at ¶ 40; ECF No. 382-67 at 11.

On November 10, 2010, Zurich responded to Doe Run's funding proposal by informing Doe Run that Zurich could not commit to any specific indemnity amount, "either as to plaintiff, dollar amount or percentage," but that Zurich planned to "attend and participate with Doe Run in the mediation." ECF No. 388 at ¶ 118; ECF No. 390-1, Ex. 570.

On November 12, 2010, Marc Halpern, Doe Run's coverage counsel emailed Zurich, requesting Zurich's consent to Doe Run's $44 million counteroffer to the Bronson/Smoger plaintiffs, and Zurich's funding of 50% of the global settlement. ECF No. 390-1, Ex. 571.

On November 15, 2010, Zurich responded it had no objection to Doe Run's counteroffer, but again declined to contribute to settlement in terms of a specific percentage or dollar amount. *Id*.

Approximately an hour later, Doe Run sought clarification as to whether Zurich would fund any portion of the $44 million counteroffer. *Id*. Zurich reiterated to Doe Run it would not commit at that time to fund any portion of the $44 million. ECF No. 381 at ¶¶ 42,43; ECF No 390-1, Ex. 571; ECF No. 382-70 at 3-4; ECF No 388 at ¶118. Doe Run then communicated the following to Zurich:

"The defense is conducted by Lewis Rice . . . . The defense is not conducted by Zurich. Zurich's obligation in this instance is, per its contract obligations, to head [sic] the request of defense counsel and to confirm funding." ECF No 390-1, Ex. 571.

Heading into mediation, Zurich's claims analyst, Bradley Rausa, conceded in his claims diary his biggest concern was that Zurich did not have the authority to commit to funding and could not get it. ECF No. 382-73 at 28. Earlier in 2010, Zurich's coverage counsel had recommended a reserve increase for the Bronson/Smoger litigation, but Zurich did not increase the reserves until 2011. ECF No. 381 at ¶¶ 32-34, 54; ECF No. 382-43 at 5. Eight days before mediation, Mr. Rausa acknowledged Zurich would not "be in any position to pay money or agree to pay money at the mediation." ECF No. 381 at ¶ 41; ECF No. 382-72 at 2. Mr. Rausa's claim notes further acknowledge Zurich was aware of the possibility of Doe Run settling without Fluor if Fluor failed to contribute. ECF No. 430-9, Ex. 89, at 6.

On November 18, 2010, the mediation of the Bronson/Smoger Lawsuits was conducted and representatives from Fluor, Doe Run, Zurich, and the underlying plaintiffs attended. ECF No. 381 at ¶ 45. Counsel for the Bronson/Smoger plaintiffs only communicated with the mediator or with Doe Run regarding settlement. ECF No. 388 at ¶ 140. Fluor's representatives kept to themselves at

mediation to avoid demands for Fluor's contribution. ECF No. 408-30. Zurich told the mediator it did not have authority to commit any money toward settlement. ECF No. 381 at ¶ 46.

During the mediation, Zurich was advised that if plaintiffs' $60 million global demand to settle with all defendants (including Fluor) was not met, the plaintiffs would settle separately with Doe Run and "make up the difference" from Fluor. *Id*. at ¶ 47. Plaintiffs later made a separate offer of $53 million to Doe Run. ECF No. 388 at ¶ 156. The mediator informed Doe Run the global settlement amount of $53 million was to be kept confidential from Fluor as an express condition made by plaintiffs' counsel. *Id.* at ¶ 156-57.5 Doe Run conveyed the confidential settlement amounts negotiated to Zurich and stated the amounts could not be divulged to Fluor. *Id*. at ¶ 167. The mediator informed Fluor that Doe Run had reached an agreement in principle to settle with the plaintiffs. *Id*. at ¶ 164. Despite this tentative agreement, the Bronson/Smoger plaintiffs' $60 million global demand was not withdrawn until plaintiffs and Doe Run finalized settlement on December 13, 2010. ECF No. 430-43, Ex. 123, 105:2-106:11. Given that Fluor and Doe Run's interests had diverged, Zurich assigned Catherine Tetzlaff as Fluor's new claims adjuster. ECF No. 436-4, Exhibit 264.

After mediation concluded, Zurich did not inform Fluor of the amount of the separate settlement offer of $53 million, or the $7 million delta (to meet plaintiffs'

still pending $60 million demand). ECF No. 381 at ¶ 49. However, on December 7, 2010, Edward Dowd, counsel for one of the Doe Run entities, contacted Fluor's independent defense counsel, Jack Quinn. ECF No. 388 at ¶ 187. Mr. Dowd discussed Fluor's settlement opportunity with Mr. Quinn. Mr. Dowd informed Mr. Quinn Fluor could settle "pretty cheaply" for "a few million dollars." ECF No. 388 at ¶ 188. ECF No. 393-3, Ex. 13, Dowd Tr., 86:14-87:13, 101:2, 103:8-12. Mr. Dowd did not convey the specific number of plaintiffs' $53 million offer, but he indicated to Mr. Quinn the gap to settle was very small. ECF No. 448-5, Ex. E, Dowd Supp. Tr. 140:18-141:19. Mr. Dowd warned Mr. Quinn "about the threat of punitive damages in the City of St. Louis representing a lead smelter against a bunch of kids . . . ." ECF No. 388 at ¶ 189; ECF No. 393-3, Ex. 13, Dowd Tr. 87:23-88:14. Mr. Quinn's response to this overture was: "everybody's not as worried about lead as [Doe Run is]." ECF No. 388 at ¶ 190; ECF No. 393-3, Ex. 13, Dowd Tr. 88:8-14.

After talking with Mr. Dowd, Fluor's defense counsel, Mr. Quinn, summarized their phone conversation in an email to Fluor. ECF No. 392-1, Ex. 7, Ex. 672. Mr. Quinn stated he informed Mr. Dowd it would not do plaintiffs any good to contact Fluor about settlement because the cases were defensible, and Fluor had insurance for some of the cases as well as indemnification rights against Doe Run. *Id*. Mr. Quinn also told Mr. Dowd that "Fluor [was] not paying either

plaintiffs or [Doe Run] and [was] willing to go to trial." *Id*.

It is undisputed Fluor never contributed funds to achieve a global settlement.

In this same time frame after mediation, on November 22, 2010, Doe Run's coverage counsel contacted Zurich and demanded Zurich commit to funding $26.5 million towards Doe Run's separate settlement of $53 million. ECF No. 388 at ¶ 181. On December 1, 2010, Zurich responded to Doe Run's request. ECF No 390-1, Ex. 573. Zurich did not commit to funding and told Doe Run that Fluor could not agree to any settlement favoring one of its insureds over the other. Id. On December 2, 2010, Doe Run contacted Zurich and demanded Zurich commit to funding for the 20 Bronson/Smoger plaintiffs Zurich conceded alleged exposure during the Policy periods. Id. In response, Zurich maintained it was entitled to fully investigate the claims and indicated it would respond to Doe Run when it completed its evaluation. *Id*.

A week later, on December 9, 2010, Zurich provided Doe Run with Zurich's evaluation of potential liability for the plaintiffs who were exposed to lead during the period of the Zurich policies. ECF No. 388-2, Ex. 2, Halpern Tr. 165:3-13, Ex. 17. Zurich clarified the numbers did not constitute an offer from Zurich and stated any resolution of the claims had to include Fluor. Id. On December 10, 2010, Zurich emailed Doe Run, invoking the cooperation and voluntary payments clauses within the Policies. ECF No. 388-2, Ex. 21. In response, Doe Run requested Zurich

withdraw its reservation of rights pertaining to the Bronson/Smoger cases. ECF No. 388-2, Ex. 563.

On December 13, 2010, Doe Run finalized its separate settlement agreement for $53 million with the Bronson/Smoger plaintiffs. ECF No. 388 at ¶¶ 211, 212. Fluor was not included in that settlement. *Id*. at ¶ 211. The claims against Fluor in a portion of the Bronson/Smoger litigation–the Alexander/Pedersen/Heilig lawsuits–proceeded to trial and resulted in a judgment against Fluor and its related entities for $38,527,186 in compensatory damages, and $320 million in punitive damages. ECF No. 388 at ¶¶ 232-33. Fluor appealed the verdict and judgment entered by the trial court, resulting in the appellate court decision styled Blanks v. Fluor Corporation. *Id*. at 234. In October 2014, Fluor globally settled with the Bronson/Smoger plaintiffs for approximately $300 million. ECF No. at ¶ 247. The few remaining other Herculaneum Claims were resolved prior to the initiation of this lawsuit. ECF No. 396 at ¶ 43; ECF No. 421 at ¶ 43. Prior to the resolution of the Herculaneum Claims at issue in this action, Zurich never filed an action seeking a court order determining coverage or terminating its duty to defend Fluor in the lawsuits. ECF No. 396 at ¶ 44.

On March 29, 2016, Zurich filed suit in this Court, asserting five separate claims in its Complaint. Zurich's first three Causes of Action seek declaratory judgments stating the Zurich Policies do not provide coverage for the defense or

indemnity of Fluor's litigation. Zurich's Fourth Cause of Action sought a declaration that the Zurich Policies were exhausted. Zurich's Fifth Cause of Action sought indemnity or contribution from Fluor for defense fees paid by Zurich. Fluor filed a Counterclaim against Zurich asserting three Causes of Action: 1) Breach of the Duty to Defend; 2) Breach of the Covenant of Good Faith and Fair Dealing– Bad Faith Failure to Settle and Defend; and 3) Unreasonable Refusal to Pay.

On September 30, 2019, this Court dismissed the portions of Zurich's First, Second, and Third Causes of Action seeking a declaration that Zurich's Policies do not provide indemnity coverage.

Fluor filed a motion before Judge Webber for a determination of bodily injury liability under the Policies. Zurich argued the policies were limited to $3.5 million on a per-occurrence basis. Judge Webber so found in his July 25, 2021 Memorandum. Fluor appealed.

The Eighth Circuit reversed the policy limits determination and remanded for further proceedings. The Court held:

> An insurance policy is interpreted according to the plain and ordinary meaning of its terms, "or the meaning that would be attached by an ordinary purchaser of insurance." *Seaton v. Shelter Mut. Ins. Co.*, 574 S.W.3d 245, 247 (Mo. 2019) (quoting ***Doe Run Res. Corp. v. Am. Guar. & Liab. Ins*.**, 531 S.W.3d 508, 511 (Mo. 2017)). Courts should evaluate policies as a whole when interpreting policy provisions. *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. 2009). *When an endorsement conflicts with the policy's terms, the endorsement prevails. Merlyn Vandervort Invs., LLC v. Essex Ins. Co., Inc.*, 309 S.W.3d 333, 338 (Mo. Ct. App. 2010) (citing *Abco Tank & Mfg. Co. v. Fed. Ins. Co.*, 550 S.W.2d 193, 198 (Mo.

1977)). Moreover, the last antecedent rule provides that a limiting clause "should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Paroline v. United States*, 572 U.S. 434, 447, 134 S.Ct. 1710, 188 L.Ed.2d 714 (2014) (quoting *Barnhart v. Thomas*, 540 U.S. 20, 26, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)). The last antecedent rule is not absolute, however, and can "be overcome by other indicia of meaning." *Id.* (quoting *Barnhart*, 540 U.S. at 26, 124 S.Ct. 376). Finally, the scope of subparts canon recognizes that "[m]aterial within an indented subpart relates only to that subpart." Antonin Scalia & Bryan A. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 156 (2012).

The Declarations in the policies at issue here set forth the limits for comprehensive general liability, which included bodily injury liability. The Declarations limited Zurich's liability on an "each occurrence" basis. Endorsement 7 amended the Declarations, however, stating:

> It is agreed that with respect to limits of liability for comprehensive general liability as designated under Item 3 of the policy declarations is amended to read:
>
> 500,000 each claim
>
> 500,000 each aggregate as respects incidental professional liability endorsement.

Fluor argues that Endorsement 7 amended the Declarations' limitations in a manner that limited comprehensive general liability—which, again, includes bodily injury liability—to a per-claim basis. The plain language of Endorsement 7's introductory clause, "limits of liability for comprehensive general liability," supports Fluor's reading. By contrast, Endorsement 7's limiting language, "as respects incidental professional liability endorsement," was placed in an indented subpart. Applying the last antecedent rule, Endorsement 7's limiting clause applied only to the immediately preceding phrase, "500,000 each aggregate." The scope of subparts canon leads to the same conclusion.

Zurich argues that the last antecedent rule should not apply here, because there were other indicia that the policy intended to apply a per-occurrence limit to Zurich's comprehensive general liability. Zurich contends that Endorsement 7 provided the limits of liability for incidental professional

liability coverage, which it asserts were not set forth elsewhere in the policy. But Endorsement 11, which set forth the terms for incidental professional liability, provided those precise limits:

> **The total liability of the company** for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence **shall not exceed the limit of bodily injury liability stated in the Declarations** as applicable to "each occurrence".

(emphasis added). Accordingly, the Declarations provided the limits of liability for incidental professional liability coverage.

Zurich also argues that reading Endorsement 7 as amending the comprehensive general liability limits is contrary to a holistic reading of the policy because it contradicts other important terms. When a contradiction arises, however, we enforce the policy "as altered by the endorsement." *Merlyn Vandervort Investments, LLC*, 309 S.W.3d at 338 (quoting *Abco Tank & Mfg. Co.*, 550 S.W.2d at 198). Because it as a whole may be given effect with per-claim limits on Zurich's liability, we will enforce the policy as so amended by Endorsement 7.

We conclude that *Endorsement 7 modified the limits of liability for comprehensive general liability, including bodily injury liability, to be on a per-claim basis*. The district court thus erred by determining that the policy was limited on a per-occurrence basis.

*Fluor Corp. v. Zurich Am. Ins. Co.*, 65 F.4th 387, 389–90 (8th Cir. 2023)(italicized emphasis added).

## Discussion

The parties agree that the only remaining issue is Fluor's bad faith failure to settle. They disagree, however as to whether the policies' limits have been exhausted.

**Per-claim application to limits of liability**

Zurich argues its total liability for the first two policy years is $1.5 million dollars. This is the position it held in the appeal. Conversely, Fluor argues the $1.5 million limitation is no longer applicable by reason of Endorsement 7.

Initially, the Eighth Circuit's Opinion clearly reversed Judge Webber's finding that the policies limited coverage on a per-occurrence basis. Rather, the Court concluded "that Endorsement 7 modified the limits of liability for comprehensive general liability, including bodily injury liability, to be on a per-claim basis." *Fluor*, 65 F.4th at 390.

Zurich argues the question now becomes what are the *total* limits under the policies for all claims. It urges that the total liability remains $1.5 million. In attempting to reconcile the per-claim declaration with Section 3's limits of liability, Zurich argues that the total limit applies regardless of the number of persons who sustain bodily injury or claims made; "the upshot is no matter how many claims are asserted, if there is only one occurrence, the total limit of liability for all claims is the same as the limit for one claim.  Such an interpretation is not tenable under the Eighth Circuit Opinion.

> "On remand, a district court is bound to obey strictly an appellate mandate." ***Bethea v. Levi Strauss & Co.***, 916 F.2d 453, 456 (8th Cir. 1990), *citing **In re Sanford Fork & Tool Co.***, 160 U.S. 247, 255, 16 S.Ct. 291, 40 L.Ed. 414 (1895). "If the district court fails to comply with an appellate mandate, the appellate court has authority to review the district court's actions and order it to comply with the original mandate." ***Id.***, *citing **Houghton v. McDonnell***

*Douglas Corp.*, 716 F.2d 526, 527-28 (8th Cir. 1983). Absent "explicit or implicit instructions to hold further proceedings, a district court has no authority to re-examine an issue settled by a higher court." *Id.*, *citing **Nelson v. All American Life & Fin. Corp.*, 889 F.2d 141, 152 (8th Cir. 1989). **"Every question decided by the appellate court, whether expressly or by necessary implication, is finally settled and determined." *Thompson v. Commissioner*, 821 F.3d 1008, 1011 (8th Cir. 2016).**

*Bader Farms, Inc. v. Monsanto Co.*, 100 F.4th 944, 947–48 (8th Cir. 2024), *cert. denied sub nom. Basf Corp. v. Bader Farms, Inc.*, No. 24-318, 2025 WL 76444 (U.S. Jan. 13, 2025).

In this case, the Appellate Court ordered this Court to hold further proceedings. Consistent with the Court's Opinion, the effect of Declaration 7 is that the limits of liability under the applicable policies are modified requiring assessment based on the claims filed; it is not merely substituting per-occurrence to per-claim and having the same bottom-line limit for one occurrence,

> When a contradiction arises, however, we enforce the policy "as altered by the endorsement." *Merlyn Vandervort Investments, LLC*, 309 S.W.3d at 338 (quoting *Abco Tank & Mfg. Co.*, 550 S.W.2d at 198). Because it as a whole may be given effect with per-claim limits on Zurich's liability, we will enforce the policy as so amended by Endorsement 7.

*Fluor Corp,* 65 F.4th at 390.

Zurich's interpretation would effectively render the Eighth Circuit's Opinion futile. The substitution of the per-claim for per-occurrence limit only to continue to tie the total liability to the occurrence, regardless of the number of claims, would erase any further analysis this Court is required to perform. Zurich fails to explain

how its interpretation is any different from the policy before Declaration 7. Indeed, there is no difference.  When read together, however, Section 3's occurrence limitation of liability now conflicts with Endorsement 7, requiring the Court to interpret the policy in accordance with the language and intent of the Endorsement. As such, the limit of liability is $500,000 per claim for, as Judge Webber found, one occurrence. Under the 1981 and 1982 policies, therefore, the limit of liability for the 15 potentially covered Plaintiffs is 21.5 million, as argued before the Eighth Circuit. See ECF # 814, Exhibit 145, (detailing the potential plaintiffs and the time the plaintiffs would be covered under the 1981 and 1982 policies).

**Issue Preclusion, Judicial Estoppel, and Evidentiary Admissions**

Zurich alternatively argues the available policy limits are zero for the independent reason that Fluor cannot prove any of the Bronson-Smoger plaintiffs claims against Fluor triggered any of the policies because it is estopped based on issue preclusion, judicial estoppel, and evidentiary admissions. Although Zurich contends Fluor has conceded this argument by not addressing it in its opposition to the Motion, Fluor has indeed addressed the argument, albeit it did not specifically use Zurich's characterization of the argument.

"The interpretation of an insurance policy is a question of law." *Hartford Ins. Co. of the Midwest v. Wyllie*, 396 F.Supp.2d 1033, 1038 (E.D. Mo. 2005) (citing *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liability Ins.*

*Co.*, 989 S.W.2d 168, 171 (Mo. 1999)). "An insurance company has a duty to defend whenever the insured is exposed to potential liability, 'no matter how unlikely it is that the insured will be found liable and whether or not the insured is ultimately found liable.' " *Hartford*, 396 F. Supp. 2d at 1037-38 (citing *Truck Ins. Exchange v. Prairie Framing, LLC*, 162 S.W.3d 64, 79 (Mo. Ct. App. 2005)) (quoting John Alan Appleman, 7C Insurance Law and Practice § 4684.01 (Walter F. Berdal, ed.1979)); "The duty to defend is determined by comparing the language of the coverage afforded in the policy with the allegations in the pleadings." *Hartford*, 396 F. Supp. 2d at 1038 (citing *McCormack*, 989 S.W.2d at 170; *. Am. Fam. Mut. Ins. Co., S.I. v. Coyne*, 635 F.Supp.3d 759, 762 (E.D. Mo. 2022).

Zurich argues Judge Webber's September 30, 2019 Memorandum and Order is inapplicable to whether the bad faith failure to settle claim is viable because the Memorandum and Order dealt with the dismissal of Zurich's indemnification affirmative defenses, and did not find it owed a duty to defend. Further, because Fluor must prove its own claim of bad faith. Zurich argues Fluor is estopped from pursuing its bad faith failure to settle claim because it took the position that it was not responsible for the plaintiffs' injuries since they occurred after the expiration of the policies.

Zurich's argument is misplaced. The Memorandum and Order articulates the law regarding the duty to defend:

The question before the Court is whether Zurich's affirmative defenses asserting a lack of coverage under the Zurich Policies fail as a matter of law in light of the undisputed facts. Fluor argues indemnity coverage is irrelevant to whether Zurich committed the BFFS tort at the time of the settlement opportunity in 2010. Fluor claims the undisputed facts show Zurich reserved the exclusive right to settle and prohibited Fluor from voluntarily assuming liability−which gave rise to Zurich's duty to act in good faith in settling the Herculaneum Lawsuits. Fluor contends a determination of coverage now cannot immunize Zurich for its conduct in 2010 and therefore, the Indemnity Defenses fail as a matter of law. Zurich responds that under Missouri law, where there is no coverage, an insured has no claim for bad faith. Zurich argues the Court should deny summary judgment on its Indemnity Defenses as proof of lack of coverage will defeat Fluor's BFFS claim.

Under the undisputed language of the Zurich Policies, Zurich had the "right and duty to defend any suit against the insured seeking damages . . . [and to] investigat[e] and settle[…] any claim or suit as it deems expedient." FSUMF, ECF No. 221-1 at ¶ 2. The Zurich Policies also provided the insured "shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense." Id. at ¶ 3. It is uncontested that: Fluor tendered the Herculaneum Lawsuits to Zurich for a "full and complete defense;" Zurich agreed to defend the claims pursuant to a reservation of rights; and, the reservation of rights reaffirmed Fluor's "duty to refrain from making voluntary payments or voluntarily assuming obligations." FSUMF, ECF No. 221-1 at ¶¶ 5-11, 15-21, 25.

Thus, at the outset, when Fluor tendered the lawsuits to Zurich and Zurich agreed to defend under a reservation of rights, *the potential for coverage existed, giving rise to Zurich's duty to defend Fluor*. The policies' language vests Zurich with the right to control litigation and settlement, giving rise to a fiduciary relationship between the parties, exposing Zurich to tort liability if it failed to evaluate and negotiate third-party claims in good faith. Moreover, based upon the language of the policies and Zurich's reservation of rights affirming Fluor's duty to refrain from voluntarily assuming obligations, Zurich had a duty to act in good faith with regard to the 2010 settlement opportunity.

Zurich's Indemnity Defenses relate to whether indemnity coverage is "barred" or otherwise "unavailable" under the Zurich Policies. A proper

affirmative defense "if true, will defeat the plaintiff's ... claim, even if all allegations in the complaint are true.'" *PNC Bank [v. Tovar, Incorporated*], 2014 WL 538810, at *7 [E.D. MO Feb. 11, 2014]. Zurich argues a determination of no coverage will bar Fluor's BFFS claim under Missouri law. Zurich cites to several cases in support of its contention, all of which are inapposite to the circumstances here and do not support the contention that an indemnity obligation must be proven as a threshold to establishing a BFFS claim.

       *      *      *      *      *      *

The Court further concludes that a determination on coverage here, after Zurich's alleged bad faith conduct occurred, is irrelevant to and cannot defeat Fluor's BFFS claim. See *Advantage Bldgs. & Exteriors, Inc. v. Mid-Continent Cas. Co*., 449 S.W.3d 16, 28 (Mo. App. W.D. 2014)(concluding that because the trial court's coverage ruling came after the insurer had already refused to settle, the court did not abuse its discretion in excluding evidence of that ruling on the basis that it was irrelevant, confusing, and prejudicial). From a common-sense standpoint, Zurich's proposal would allow insurers to undertake the defense of a claim, bar the insured from voluntarily making payment on the claim, fail to act in good faith with regard to settlement opportunities, and later evade BFFS liability for this conduct by procuring a determination at trial or otherwise that coverage was non-existent—a fact that was not established at the time of the alleged bad-faith conduct.

ECF Doc. No. 322, 15-17. There can be no bar based on estoppel. The relevant inquiry regarding the bad faith failure to settle claim arose when Fluor tendered the defense to Zurich. Fluor's subsequent representations regarding its liability based on the expiration of the policies is not relevant to the claim, and thus cannot bar the claim. Fluor is not seeking indemnification from Zurich which likely is barred by the estoppel theories.

Indeed, Judge Webber once again reiterated Zurich's duty was not extinguished by Fluor's later contentions that the claims arose after the expiration of the policies.

> "'The duty to defend is broader than the duty to indemnify.'" *McCormack Baron Mgmt. Servs., Inc. v. Am. Guarantee & Liab. Ins. Co.*, 989 S.W.2d 168, 170 (Mo. 1999) (quoting *Butters v. City of Indep.*, 513 S.W.2d 418, 424 (Mo. banc 1974)). "To suggest that the insured must prove the insurer's obligation to pay before the insurer is required to provide a defense would make [the duty to defend] provision a hollow promise . . . ." *McCormack*, 989 S.W.2d at 170. "The duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependant [sic] on the probable liability to pay based on the facts ascertained through trial." Id. The duty to defend potentially insured claims arises "even though claims beyond coverage may also be present." *Advantage*, 449 S.W.3d at 22 (citing *Truck Ins. Exch.*, 162 S.W.3d at 79).
>
> The duty to defend is determined at the outset by comparing the language of the insurance policy with the allegations in the complaint. *McCormack*, 989 S.W.2d at 170; see *Butters*, 513 S.W.2d at 424; *Zipkin v. Freeman*, 436 S.W.2d 753, 754 (Mo. banc 1968). If the complaint merely alleges facts that give rise to a claim potentially within the policy's coverage, the insurer has a duty to defend. *McCormack*, 989 S.W.2d at 170-71; see *Butters*, 513 S.W.2d at 424; *Zipkin,* 436 S.W.2d at 754. Any uncertainty as to the policy's coverage should be decided in favor of the insured. *Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919, 924 (8th Cir. 1998) (citing *Reliance Ins. Co. v. Shenandoah South, Inc.*, 81 F.3d 789, 791–92 (8th Cir. 1996)).
>
> If there is any possibility of coverage-no matter how unlikely that possibility may be-the duty to defend persists. *Charter Oak Fire Ins. Co. v. Nelson*, No. 13-6085-CV-SJ-ODS, 2014 WL 5107025, at *5 (W.D. Mo. Oct. 10, 2014). "To extricate itself from a duty to defend the insured, the insurance company must prove that there is no possibility of coverage." *Kirk v. Cont'l W. Ins. Co.*, 123 S.W.3d 259, 264 (Mo. Ct. App. 2003) (citing *McCormack*, 989 S.W.2d at 170); see also *Zurich Am. Ins. Co. v. U.S. Eng'g. Co.*, No. 18-cv-00933, 2012 WL 13028219, at *4 (W.D. Mo. May 30, 2012) ("[O]nce it is determined that an insurance policy does not provide coverage for a claim, an insurer's duty to defend expires.").

In addition, a court's declaratory judgment ruling that a claim is not covered only relieves the defending insurer of its duty to defend the case going forward, it does not nullify the initial determination that the claim was potentially covered. *Liberty Mut. Ins. Co*., 153 F.3d at 923−24.

Thus, when a defending insurer obtains a court's declaration a claim is not covered under a policy, the insurer is only relieved of its duty to defend from the date of the court's order, not retroactively.

As noted above, the duty to defend arises whenever there is a potential liability to pay based on the facts at the outset of the case and is determined by comparing the language of the insurance policy with the allegations in the complaint. The determination is made by the insurer when the claim is tendered by the insured.

Here, Fluor tendered the Herculaneum claims at issue in this matter to Zurich. Zurich, faced with uncertainty about coverage, activated its right to defend under the Policies, and reserved its right to seek a declaration that it had no duty to defend. In agreeing to defend Fluor, Zurich issued reservation of rights letters which acknowledged the allegations of the Herculaneum complaints. The letters stated the complaints alleged liability against Fluor and Doe Run, based on claims of bodily-injury to various residents and children of Herculaneum, Missouri, caused by exposure to lead, metals and other toxic substances from the Doe Run Smelter. The reservation of rights letters also acknowledge the Zurich Policies:

> generally provide that Zurich will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:
>
> > A. bodily injury or
> > B. property damage
>
> to which this insurance applies, caused by an occurrence, and [Zurich] shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage . . . .

See ECF No. 395, Exhibits 72-73, 88-103.Comparing the allegations of the complaints to the language of the Policies, Zurich's duty to defend was

triggered when it was faced with what Zurich itself characterized in its reservation of rights letters as "potentially implicated claims." Further, the record reflects that in defending Fluor, Zurich considered a portion of the plaintiffs in the Herculaneum claims as potentially covered under its Policies when evaluating its contribution to settlements.

The reservation of rights letters also permitted Zurich "the right to withdraw from its agreement to defend Fluor and/or to seek to extinguish any alleged defense obligation if it becomes apparent that there is no potential for coverage of any of the claims asserted . . . ." See ECF No. 395, Exs. 72-73, 91-103. It is undisputed, however, Zurich did not exercise its "right to withdraw" from defending Fluor or "seek to extinguish" its defense obligation by obtaining a judicial declaration before the Herculaneum claims at issue here were resolved. Because the possibility of coverage arose when the Herculaneum Claims were tendered, and persisted until the Claims were resolved, the Court finds Zurich's duty to defend Fluor continued until the resolution of the lawsuits.

When a defending insurer seeks a declaratory judgment regarding coverage under the policy, the court's role is to eliminate uncertainty prospectively as to the insurer's continuing obligation to provide a defense. See *Liberty Mut. Ins. Co.*, 153 F.3d at 923- 924. Any resolution of the question of coverage will not retroactively eliminate the insurer's duty to defend the insured. *Id.* Zurich is no longer under a continuing obligation to defend the Herculaneum Claims, which were resolved prior to the filing of this suit. Therefore, based on the facts, the Court cannot provide prospective relief as to Zurich's duty to defend, and in accordance with Missouri law, the Court may not provide retrospective relief and nullify the consequences of Zurich's initial determination that the claims may have been potentially covered. Therefore, the Court will grant summary judgment against Zurich with respect to Zurich's First, Second, and Third Causes of Action in its Complaint.

## Conclusion

As discussed herein, Endorsement 7 modified the Zurich policies to change

the limits of liability under the 1981 and 1982 policies to $500,000 per claim. As

such, the total limit of liability under these policies is $21.5 million. Fluor's

subsequent position that the claims arose after the Zurich policies expired does not

bar its bad faith failure to settle claim. Ergo, Zurich's argument that the limit of its

liability is $3.5 million is without merit. Likewise, Zurich's argument that its limit

of liability is zero lacks merit.

Accordingly,

**IT IS HEREBY ORDERED** that Motion to Determine the Applicable

Policy Limits as a Matter of Law, [Doc. No. 798], is denied.

Dated this 27th day of March,  2025.


_____

HENRY EDWARD AUTREY

UNITED STATES DISTRICT JUDGE429